And we move to the fourth case this morning, Swann U.S. v. Swinney. Ms. McNally, are you proceeding initially? Yes, your honor. All right. I think we don't have the AUSA yet. Oh, that's right. He's not even seeing it. Okay, thank you. Mr. Kerwin, you're out of the green there, and Ms. Ramos, you have a law student representing you, I guess, right? Yes, your honor. Thank you. And you may proceed. Good morning, your honors, and may it please the court. My name is Claire McNally, and I'm a law student at the University of Illinois. I represent Mr. Tyshawn Swinney under the supervision of Colleen Ramey. When officers respond to an anonymous tip of general criminal activity, they are required to corroborate that tip. Officers failed to do so before detaining Mr. Swinney in violation of his Fourth Amendment rights. Police were dispatched to Ida Liquor on November 18th, 2019 based solely on a bare bones anonymous tip of general criminality, specifically that a man had entered the store with a gun in his pocket. But may I just say what strikes me as the distinction between the communication from the dispatcher here and the information in Florida against J.L.? And I'm going with you for the moment and assuming that the only thing we can look at is what the dispatcher said. But the dispatcher says, first of all, the description of the clothing just pulled out, and the word just appears twice. So the dispatcher is communicating contemporaneous observation. And the dispatcher also doesn't just point out somebody with a certain description, say, this individual has a gun. The dispatcher says he just pulled a large gun out of his pocket and then just walks into this Ida Liquor store, I'm an opera fan, so that's how I'm pronouncing it, on South Halsted.  that the individual has a gun. It was observed. And we don't have that in Florida against J.L. We also have this contemporaneous account. And finally, we know because the police officers say so once they're in the store talking to Mr. Swinney, we know that the arresting officer realized that this came in through the 911 system. So those all strike me as maybe not the most overwhelming thing. Judge Chang said maybe there's stronger cases, but as perhaps enough. So maybe you could comment on that. Yes, Your Honor. While there is slightly more information relayed over dispatch in this case than in J.L., it is still a very close case and much less information than was relayed in Navarette. And Navarette had the additional benefit of referring to an actual emergency as opposed to general criminality. But how do we know that there isn't some emergency if somebody just pulled a large gun out of his pocket and then walks into a liquor store? I mean, wouldn't a rational person think maybe he's planning on robbing the liquor store right now? It was certainly rational for the police to respond to the dispatch. And it was important that they did so. But all the information they were given was that a specific person had a specific gun in a specific location. When they entered the store, it was immediately apparent that no emergency was occurring. But it was a violation of Illinois law, right? Doesn't Illinois law prohibit carrying guns into liquor stores? It's not like Texas, where you almost are required to carry a gun in, but it's against the law in Illinois to do that, right? So already there was a violation. Yes, Your Honor. However, Illinois criminalizes many things that don't constitute a public emergency. And in JL, the court raised the concern that general criminality allegations could allow someone to place an anonymous call falsely reporting the target's unlawful carriage of a gun. So the Supreme Court envisioned that general criminality could include carrying a gun unlawfully. But in JL, there was no, it's just a plaid shirt. A guy wearing a plaid shirt is all we know in JL. You know, you or I could look out the window and see somebody down in the street and give the police a very good description of them with no knowledge whatsoever, whether they have a gun or whether they have illegal drugs or whether they have a picture of their baby or whatever they may have. Which is what, I think that's the critical distinction between this dispatch and the JL one. We see the reporter, the caller sees the gun. Yes, Your Honor. However, it would be equally possible for me to see somebody across the street. And if I was attempting to harass another as the JL court is concerned about, I could just as easily say the person I see going into the liquor store has a gun or has just pulled a gun, even if I don't actually see it. The concern remains the same that when it's a general criminal activity, as opposed to an emergency, you don't have the same indica of reliability as the Navarrette court had when they were responding to a drunk driver who was actively running cars off the road. But isn't that where the 911 factor comes in? You're quite right. Somebody could call 911 and simply lie, you know, and say, I saw such and such individual pull a gun out of his pocket and put it back in again. And it could just be a flat out lie. But the 911 system does give us some deterrence for that kind of lying because of the ability to trace the calls. The dispatch that the officers received, the dispatcher explicitly said, no number on the callback, no number on the callback, twice. So what responding officers knew at the moment that they detained Mr. Swinney was that there was no contact information for the person who called. When they then entered the store and saw that there was no active emergency, Mr. Swinney wasn't robbing it. Mr. Swinney wasn't brandishing his gun, arguing or making furtive movements. They had an obligation to corroborate this anonymous tip. They could have asked to speak to Mr. Swinney. They could have observed the scene for more than a second and not gone directly to detaining Mr. Swinney. That is what the appropriate course of action is when there is no emergency. Well, you're indicating they could have waived him from him to pull the gun. Is that the idea? No, Your Honor. At the moment they walked in, there really was no reason to assume he would pull a gun any more than any other person who carries a gun, which millions of Americans do. It's illegal to have a gun in the liquor store, right? Yes, Your Honor. But he was standing there holding groceries like all the other passerbys. And the officers immediately took the step to detain him without any further corroboration. I'm not clear what you think they should have, I think this is what Judge Kaney is getting at too, what you think they should have done. I mean, they briefly talked to him. They wanna pat him down though, because they've been told he has a gun. Whether he was planning on doing anything with the gun, and I thought that was one of the things Terry especially singles out as a permissible reason. If you've got reasonable suspicion to think somebody's armed, the police for their own safety can conduct that limited pat down. Your Honor, I would argue that they didn't speak to him as so much as they immediately pulled him out of line and detained him. And it was at that point that they conducted the pat down. And I think that is the point where more independent corroboration was needed, given that there was not an emergency situation, merely generalized criminal activity of illegal gun possession, the same as envisioned by the jail court. If the court has no more questions, I will reserve the remainder of my time for rebuttal. Thank you, counsel. Thank you. Mr. Kerwin. Good morning, you may please the court. Brian Kerwin on behalf of the United States. Your Honor, the district court correctly denied defendant's motion to suppress in this case. Police conducted a lawful Terry stop and protective pat down in response to a detailed 911 call made by an eyewitness who made contemporaneous observations of defendant violating multiple state laws. First, by brandishing a firearm on a Chicago street, and then by carrying that firearm into a liquor store. Now you use the word brandish several times in your brief too. All he did, he pulls it out of his pocket and puts it back in again. He's not like waving it around or anything. It's threatening nearby people. That's true, Judge. He's not threatening anyone. He's not, you know, as far as we can tell, threatening the caller herself. But that act alone is a crime in Illinois, as your Honor's pointed out. And to this caller, at least, the way that he handled that firearm was menacing enough to prompt the call in her 92nd report in which she, you know, described how scared she was and the concern that it raised in her mind. But the officers don't know that part. The only thing the officers know is this brief summary that the dispatcher offers. That's correct, Judge. There's no commentary on how terrified the caller may have been, or in fact, we don't even hear about the jeans and the white shoes or other things. Right, and I think your Honor is alluding to sort of the distinction between what the 911 operator reported and what gets relayed to the officers themselves. And whether you look at the call in a vacuum or the dispatch in a vacuum, as your Honor alluded to in questions to counsel, both of those sort of narrations describe a 911 call of a contemporaneous eyewitness. Now, what I would like to clarify, Judge Wood, is that the cases in this context make fairly clear that the call itself is fair game when analyzing the reliability of the call. The test in Navarette itself focuses on the call and the caller. Was the call transmitted through 911? Was the caller transmitting events to the 911 operator as an eyewitness or contemporaneously? And that's consistent with- You can tell both of those things from what we have in this record. We know the contemporaneity of it from the just pulled out the gun, just walked into the store, as you said. And we know about that they somehow realized it was 911. I'm not sure how technically they knew this, but they say to Mr. Swinney, as they pull him out of line, we have a 911 call. I don't know whether, maybe this record doesn't show whether things that come in through the 911 system show up differently on the squad cars or the officer's personal equipment, but somehow they know this because they say it. Right, so I agree, Judge. It's not entirely clear how they know it, but they know it by nature of, or by the nature of the dispatch itself, perhaps by the fact that they were told, there's no number on the callback and they're being told it by a 911 dispatcher. In any event, the reason I draw that out, despite Your Honor's observation, that we have this 911 contemporaneous observation in either bucket is because I don't think it's the binary choice that defense counsel is sort of advocating here. And even in a case that we're much closer than this one, where those Navarette factors weren't specifically relayed in an emergency setting to the responding officers, it would be appropriate for the court to look to the call itself. And that's why we raise the collective knowledge cases in this context in our brief. And that's why we highlight the ways in which Navarette and its progeny focus on the call and the caller when assessing the reliability of the tip. But there's no issue raised about this in Navarette, as I recall. I mean, yes, they focus on the call and the caller, but until somebody says, but wait a minute, here's all this extra information that the caller gave to the 911 dispatcher that never reaches the police, usually you're gonna look at what the police knew at the time they take the action when you're assessing whether it's reasonable suspicion or probable cause or any other frame of mind. You don't revert back to collective knowledge until you're in a more complex operation where maybe the dispatching officer says, I need you to go arrest this person, and that person is entitled to believe that the dispatching officer has the correct information, that that knowledge is all attributed to everybody. I'm not sure this is, and indeed, Judge Chang wasn't sure that this really fits collective knowledge either. He expressed his real concern about that. Well, I agree, Judge. Judge Chang expressed uncertainty, and I think he did in part because the government didn't raise it, and the government didn't raise it because the argument below focused on the nature of the call and the content of the call. Now, to your point about how- So there's no need for us to reach out and give some advisory opinion on collective knowledge when, I mean, Judge Chang, as you know, is a very experienced district judge. He'd been in the U.S. Attorney's Office. He's not a novice in these things, and so I would take seriously his comment. Gee, I'm not so sure about this, but let's put it to one side. Even without that, is there enough here? And he concludes yes. And we agree with that, Judge, and the reason I raise it this morning is because of the forceful argument that the defendant makes in the briefing that you can only consider the dispatch and not the call itself. To the extent that the court viewed that dispatch as somehow deficient in the context of the Navarette test, I simply point out that there are cases, particularly Drake and Whitaker, that say in a context where not every detail is relayed by the dispatcher to the responding officers, it's appropriate to consider what the dispatcher knew is imputed to those officers for this purpose. But I do agree with your honor that the dispatch itself satisfied the Navarette standard. The officers knew that this was a 911 call that was made by a contemporaneous eyewitness. That call, therefore, was reliable, and they could act on it. And because it created reasonable suspicion that criminal activity was afoot, not just a crime that had occurred on the street, but one that was ongoing inside the liquor store, those officers were justified in stopping and frisking the defendant. When they found him inside the store just minutes after the call was made, precisely where the caller would be, because those actions were constitutional, Judge Chang properly denied defendants' motion to suppress the firearm that they recovered. So unless the panel has any additional questions for the government, I'd cede the remainder of my time and ask the court to affirm the judgment of the district court. Thank you, Mr. Thurmond. Ms. McNally? Your honors, even if we consider the full content of the 911 call, it is still anonymous call alleging general criminal activity. There is a distinction between an emergency situation, which requires less corroboration, and an allegation of simple possession of a gun. In the latter case, we ask the court to hold that some level of corroboration is necessary to establish reasonable suspicion. The officers could have just asked to speak with Mr. Swinney and may have gained reasonable suspicion through that conversation or through observation of his demeanor. Thank you. Thank you, Ms. McNally. And I would say, as a law student, you've done very well in arguing on behalf of your clients. Thank you very much. And Mr. Kirwan as well, and also Mr. Ramos for supervisor. Thank you. The case will be taken under advisement.